E-FILED
Thursday, 08 June, 2006  08:20:27 AM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

```
SUSAN SVEJDA,                       )
                                    )
          Plaintiff,                )
                                    )
     v.                             )        Case No. 04-1263
                                    )
MERCANTILE BANCORP, INC. AND        )
NAMED SUBSIDIARIES LONG TERM        )
DISABILITY PLAN, MERCANTILE         )
BANCORP, INC., and CONTINENTAL)
CASUALTY COMPANY,                   )
                                    )
                                    )
          Defendants.               )
```

## O R D E R

Before the Court are Defendant Continental Casualty Company (Continental's) Motion for Summary Judgment And/Or Judgment on the Merits [Doc. # 21]; Plaintiff's Motion for Summary Judgment [Doc. # 22]; Mercantile Defendants Adoption of Defendant Continental's Motion for Summary Judgment [Doc. # 23]; and Continental's Motion to Strike Exhibits to Plaintiff's Motion for Summary Judgment [Doc. # 25]. For the reasons that follow the Court will grant summary judgment to Plaintiff and deny the other motions.

### BACKGROUND

Plaintiff began working for Defendant Mercantile Bancorp, Inc. ("Mercantile") in February 1988 and she continued to work there until March 11, 2002. At the time she left Mercantile, Plaintiff was eligible for coverage under the terms of the Mercantile Bancorp., Inc. and Named Subsidiaries Long Term Disability Plan ("the Plan"). The Plan was established and is maintained by Mercantile for the purpose of providing for its participants or

their beneficiaries benefits in the event of sickness, accident or disability, and is a "plan" within the meaning of ERISA § 3(3), 29 U.S.C. § 1002(3). Mercantile is the Plan Administrator and a named fiduciary under the Plan.  (Plaintiff's Motion for Summary Judgment, Doc. # 22 Ex. 4 at II.) The Plan is administered by Mercantile through an insurance contract purchased from Continental. (<u>Id.</u>) Under the Plan, the term "Total Disability" is defined as follows:

> 'Total Disability' means that, during the Elimination Period and Your Occupation Period shown in the Schedule of Benefits, You, because of Injury or Sickness, are:
> (1)  continuously unable to perform the substantial and material duties of Your regular occupation;
> (2)  under the regular care of a licensed physician other than Yourself; and
> (3)  not gainfully employed in any occupation for which You are or become qualified by education, training or experience.
> After the Monthly Benefit has been payable for Your Occupation Period, 'Total Disability' means that, because of Injury or Sickness, You are:
> (1)  continuously unable to engage in any occupation for which You are or become qualified by education, training or experience; and
> (2)  under the regular care of a licensed physician other than Yourself.

(<u>Id.</u> at 4-5.)  The Plan defines "Elimination Period" to mean "the number of days at the beginning of a continuous period of Disability for which no benefits are payable" and sets the Elimination Period at 90 days.  (<u>Id.</u> at 2, 4.)  Under the heading "Your Occupation Period," the Plan provides a period of 36 months. (<u>Id.</u> at 2.)  Under the insurance policy associated with the Plan, "[t]he Administrator and other Plan fiduciaries have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to benefits in accordance with the

2

Plan." (Id. at 15.)  Under the Plan, Continental also reserves the right to have a physician examine a participant who seeks benefits "as often as reasonably necessary while the claim is pending." (Id. at 8.)

The following facts regarding Plaintiff's medical condition and job at Mercantile are taken from the administrative record attached to Defendant Continental's Motion for Summary Judgment.[1]

On October 9, 2001, Dr. Douglas N. Sullivant, M.D., examined Plaintiff.  He noted (1) that Plaintiff was a well known patient to him with a history of multiple sclerosis ("MS"); (2) that Plaintiff had some problems with fecal incontinence and that she also had a long standing problem of irritable bowel and diarrhea, which remained a problem; and (3) that Plaintiff had problems with daytime fatigue.  (AR 0099.)

On January 7, 2002, Dr. Sullivant noted that Plaintiff had been seen at the Mayo Clinic for an evaluation of her irritable bowel syndrome ("IBS").  He remarked that, it was largely a "benign work-up" but that the IBS was still Plaintiff's main concern.  Dr. Sullivant noted that the Mayo Clinic doctors had concluded that Plaintiff's GI problems may have had nothing to do with her MS since they preceded her neurologic history by so many years.  He also noted that Plaintiff had been evaluated by the Mayo Clinic Neurology department for the MS, and that they basically came to the same conclusions as Dr. Sullivant.  The Neurology Department recommended immunomodulating drugs, which Dr. Sullivant could

---

[1]All citations to this record are hereinafter referred to as "AR".

provide.   Dr. Sullivant prescribed Avonex.   At that meeting Dr. Sullivant discussed the signs of depression and treatment options for Plaintiff's fatigue.   Plaintiff largely dismissed depression as out of hand.   (AR 0098, 0100.)

On January 23, 2002, Dr. Sullivant's notes indicate that Plaintiff had some worries about taking Avonex because of her bowel control problems.   In response, Dr. Sullivant instructed Plaintiff to contact her GI doctor.   (AR 0100.)   Dr. Sullivant   examined Plaintiff again on May 7, 2002.   Plaintiff had complained of diplopia, and Dr. Sullivant observed left mesial deviation of her eye.  He stated that Plaintiff had continuing complaints of diffuse chronic imbalance, no energy, decreased interest in activities, and hedonism.   He also stated that Plaintiff clearly had signs of depression, and that he hoped the Zoloft he had recently started her on would provide some benefit.   He explained to Plaintiff that in individuals with MS, upwards of 50% can develop vegetative signs of depression.   (AR 0102-03.)

On or about May 28, 2002, Plaintiff's employer submitted her claim for disability to Continental for review.   (AR 0142-46.) Plaintiff's last date worked was listed as March 11 , 2002.   (AR 0143.) A job description attached to the claim identified Plaintiff's occupation as Loan Clerk.   The essential duties of a loan clerk include (1) typing information into a computer to prepare important documents, (2) proofreading, (3) sorting, (4) photocopying, (5) answering the telephone and conveying messages, (6) Processing   commercial,   mortgage,   and   consumer   loan

applications, (7) and maintaining department files.   (AR 0144-0145.)   The physical demands of Plaintiff's occupation were described as follows:

> While performing the duties of this job, the employee is frequently required to sit and talk, or hear.   The employee is occasionally required to stand; walk, use hands and fingers to input data, handle, or feel objects, tools, or controls; and reach with hands and arms.   The employee must occasionally lift and/or move up to 25 pounds. Specific vision abilities required by this job include close vision, color vision, and the ability to adjust focus.

(AR 00145.)

Plaintiff subsequently submitted an Attending Physician's Statement signed by Dr. Sullivant, on June 3, 2002.   (AR 0136-37.) Dr. Sullivant diagnosed Plaintiff as having "Multiple sclerosis, Diplopia, Depression."   Dr. Sullivant described Plaintiff's symptoms as chronic imbalance, no energy, and decreased interest in activities and hedonism.   (AR 00136.)   Dr. Sullivant's physical limitations stated that Plaintiff was very fall prone, and that she therefore needed to avoid heights and balancing.   Dr. Sullivant's prognosis was "poor balance & moderate dystaxia, avoid such actions and heights for life, course <u>may</u> be progressive."   (AR 0137.)

Plaintiff's employer filled out a Physical Demands Analysis for her occupation as a Loan Clerk on July 10, 2002.   It stated that Plaintiff's occupation involved 30 minutes of standing, 30 minutes of walking, and 1 hour of sitting at a time.   Plaintiff sat a total of 6 hours per day, with 1 hour of standing and 1 hour of walking total.   Plaintiff pushed a loan cart with 50 pounds of force up to 75 feet twice a day.   Otherwise, Plaintiff was required

5

to lift files and coin drawers weighing up to 10 pounds.  The Employer noted that Plaintiff's "job could not be modified for any period of time."  (AR 0112.)

On August 14, 2002, Continental Casualty wrote to Plaintiff to advise her that her claim for long-term disability benefits had been denied, stating that, "while it would appear a medical condition exists, it does not confirm an inability to perform the duties of your occupation or indicate a disabling impairment.  In addition, the restrictions given by your physician to avoid heights and balancing do not appear to be within the scope of your job function."  Continental also advised her of her appeal rights.  (AR 0091-93.)  On November 4, 2002, Plaintiff formally appealed the decision to deny benefits, and enclosed further medical records for review.  (AR 0054-90.)

The additional medical records demonstrated that an MRI of Plaintiff's brain was performed February 8, 2001.  Dr. M. Lynn Terry reported that the findings of the MRI were consistent with a diagnosis of MS, however there was a possibility that the findings of the MRI were attributed to a neoplastic process.  A repeat MRI examination in 2 months was recommended.  (AR 0057.)

Neurologist Dr. Claudia Lucchinetti of the Mayo Clinic examined Plaintiff on December 18, 2001 for an evaluation of MS.  Dr. Lucchinetti indicated that the lesion distribution from the MRI done in February 2001 was compatible with the diagnosis of MS.  Her diagnoses for that visit was MS.  (AR 0076.)  Neurologist Dr. Istvan Pirko of the Mayo Clinic also examined Plaintiff that day.

6

He concluded that it was hard to know whether Plaintiff's ongoing bowel symptoms were a consequence of MS or not.  He stated that it could certainly be possible, however, it is rather unusual to have disease onset with GI symptoms only.  He then stated that he would like to get an opinion from the Mayo Clinic GI colleagues in regards to Plaintiff's suspected IBS.  Dr. Pirko planned another MRI of the brain.  His diagnoses for that visit was MS and questionable IBS.  (AR 0073-75.)  An MRI of the brain on December 19, 2001 concluded that the results were consistent with a demyelinating process, such as MS.  (AR 0079.)

Plaintiff consulted with gastroenterologist Dr. John Kim of the Mayo Clinic on December 20, 2001.  He reported on her long-standing problems with constipation since the mid 1980's, and recommended that Plaintiff continue to take Bentyl, since it apparently resolved her constipation.  He further suggested that Plaintiff take Milk of Magnesia to help her with her frequent bowel movements, and recommended a special diet to control her gas and flatulence.  (AR 0071-72.)  Plaintiff also saw Dr. Kim's supervisor, Dr. Glenn Alexander, that day, who also recommended Milk of Magnesia for Plaintiff's bowel movements.  Dr. Alexander noted that he spent a significant amount of time educating Plaintiff about IBS, and that he informed her that her MS and medications could exacerbate her IBS symptoms.  He noted that medication should be able to significantly improve her overall status.  (AR 0073.) Plaintiff was seen by Dr. Pirko on December 21 2001 to go over her study results.  He reported on the results of

her evaluation by the gastroenterology clinic and her December 2001 MRI results.  Dr. Pirko also stated, among other things, that overall, Plaintiff's diagnosis of MS was well established.  He recommended she try Avonex.  Dr. Pirko's diagnoses for that visit was MS and IBS.  (AR 0070-71.)

On March 16th, 2002, Dr. Alexander wrote to Plaintiff regarding the colonoscopy his department performed on her.  He told Plaintiff the Bentyl she was using at night would lead to multiple loose stools with incontinence in the morning.  He also noted that Plaintiff's studies revealed she had very weakened anal sphincter pressure, and that it was difficult to treat both the incontinence and weakened anal sphincter pressure since the methods of treatment are diametrically opposed.  He therefore recommended Plaintiff be treated with Tetracycline to cut down the bacterial counts in her bowel.  He requested that Plaintiff return in the next few weeks to determine if her incontinence is secondary to a birth canal related injury versus MS.  He then made arrangements for Plaintiff to see Dr. Adil Bharucha who is an expert regarding Plaintiff's problem. (AR 0068.)

On April 3, 2002, Dr. Sullivant referred Plaintiff to Dr. David Daly for her dizziness complaints.  He noted that Plaintiff did have some true vertigo, and felt her problems were most likely due to MS, but planned an ENG to ensure there was no peripheral components.  (AR 0063.)

On April 11, 2002, Plaintiff was seen by Dr. Bharucha for her GI problems.  He reported that Plaintiff's use of Bentyl resulted

8

in her spending approximately 1-2 hours to expel semi-formed to loose bowel movements from the rectum.   He did report that Plaintiff's bowel consistency has improved considerably since Dr. Alexander started her on Tetracycline, however, he noted that if Plaintiff is unable to reach the toilet in time, she will be incontinent for semi-formed to loose stool.   He reported an anorectal manometry disclosed markedly reduced average resting and squeeze pressures, and that an EMG of the anal sphincters was normal except for poor voluntary motor unit potential activation, perhaps consistent with MS.   Dr. Bharucha's final diagnoses for that visit was MS with constipation and fecal incontinence.   (AR 0066.)

Following up on Plaintiff's April 11 visit to Dr. Bharucha, Dr. Alexander wrote a "To Whom It May Concern" letter, dated September 13, 2002.   In that letter, Dr. Alexander stated that Plaintiff's evaluation involved a normal colonoscopy, and grossly abnormal anorectal manometry, revealing markedly decreased resting and squeeze pressure, as well as paradoxical increase of her anorectal angle with squeeze.  He stated that her anorectal problem appears to be a combination of both MS and Plaintiff's previous injury to the birth canal.   He stated as a consequence of Plaintiff's anorectal dysfunction, she has significant problems with fecal incontinence.  He also stated that Plaintiff's slowed GI transit is most likely secondary to MS effects on the bowel.   He concluded that it would be quite difficult for Plaintiff to hold on to any type of meaningful employment, since she frequently needs to

9

rush to the bathroom, and frequently cannot make it due to her other infirmities.  He finally stated that Plaintiff's documented anorectal dysfunction and incontinence problems will be progressive due to her MS, and that he could not see Plaintiff improving significantly in the future, and he therefore thought that Plaintiff would need to be considered as disabled.  (AR 0064.)

On October 28, 2002, Dr. Sullivant examined Plaintiff one last time before Plaintiff's file was reviewed by Continental's own doctor.  He noted that Plaintiff's GI examinations in March 2002 along with her examinations done by the Mayo Clinic Neurology Department in December 2001 resulted in a final diagnosis of MS. With regards to his own examination, he reported that Plaintiff had no new complaints, and that she had continued dystaxia and hesitant gait, and diminished rapid alternating movements.  (AR 0055.)

Continental subsequently referred Plaintiff's file to Dr. Eugene Truchelut, for review and consultation with the treating physician.  On November 27, 2002, Dr. Truchelut reviewed Plaintiff's medical history.  He concluded that Plaintiff had some impairments, and thus, it was certainly reasonable that Plaintiff be restricted from hazardous workplace environments, as Dr. Sullivant had stated on June 30, 2002.  Regarding Plaintiff's GI/anorectal dysfunction, Dr. Truchelut also stated that this would require some workplace limitations. Specifically, Dr. Truchelut stated Plaintiff would need to be close by a restroom facility. However, Dr. Truchelut concluded that there was not enough information regarding this problem to conclude it would render her

10

unable to work at all.  (AR 0049-53.)

On December, 21, 2002, Dr. Truchelut consulted with Dr. Sullivant.  Dr. Truchelut stated that Dr. Sullivant had reported Plaintiff's past problems and current complaints with MS, and that he had recommended increased activity and exercise.  When asked whether Plaintiff could perform the low-level physical activities listed by Plaintiff's employer, Dr. Sullivant answered that he felt she could possibly do that on a physical basis, but he is not sure about her mental status.  After discussing the case with Dr. Sullivant and reviewing all of the medical evidence, Dr. Truchelut affirmed his previous conclusion that, "from a physical standpoint, it seems that Plaintiff should be able to handle sedentary-level work activities."  (AR 0048.)

On December 27, 2002, Continental advised Plaintiff it would need an additional 45 days to consider her eligibility.  (AR 0032.) On January 14, 2003, Continental wrote to Plaintiff's employer and requested that the company submit a physical demands analysis, so that Continental could clarify Plaintiff's job aspects for their review.  Specifically, Continental's correspondence included a list of seven questions having to do with such matters as the physical requirements of Plaintiff's job, the location of her desk in relation to the restroom and other locations, and feasibility of providing alternate accommodations.  (AR 0028-29.)  In response, Plaintiff's employer stated that the carrying of the coin drawer and pushing of the loan cart could be done by someone else. However, there was no way to change the drawer weight of each

drawer.  The employer also noted that the ladies restroom was in
the basement level, whereas Plaintiff's desk was on the first
floor.   The employer stated it would not be able to relocate
Plaintiff's desk, but that there was an elevator available for
Plaintiff's use.   In regards to noticing any deterioration in
Plaintiff's job performance, the employer stated,

> Employee was experiencing dizziness while walking and
> inability to maintain her balance.  Employee was wobbly
> while moving from her desk to the counter to wait on
> customers.  When rising from her desk, she would have to
> stand and prop herself up for a few moments to stabilize
> herself before walking.  We also noticed she was having
> trouble seeing and focusing her eyes on documents and her
> computer screen.   Prior to her illness, Susan's job
> performance was excellent and she was pretty much a
> perfectionist.  After being stricken with her illness she
> was exhibiting memory problems with being able to answer
> customer questions without having another employee help
> her and also having trouble remembering parts of her job
> duties.  She kept working as long as she was physically
> able.

(AR 0023-25.)

Finally, the employer specified that they had already tried
accommodating Plaintiff prior to her filing for disability, by
lightening her workload, and having somebody else carry the cash
drawer and push the loan cart.  (AR 0025.)

On February 26, 2003, the Appeals Committee upheld the denial
of Plaintiff's benefits.  Based on Dr. Truchelut's review, the
Appeals Committee noted that Plaintiff had some impairment in her
function, but that Dr. Sullivant's restriction of avoiding
hazardous work place environments was reasonable, and that the
evidence presented did not provide enough information to conclude
that Plaintiff's incontinence would render her unable to work at

12

all.  The Appeals Committee therefore concluded that the previous decision denying Plaintiff's claim to be correct and proper, and that the decision was final and binding.  (AR 0018-19.)

On or about August 3 $^{rd}$, 2004, Plaintiff filed the instant action in this Court.  Plaintiff sets forth one cause of action for wrongful denial of benefits under ERISA § 1132(a)(1)(B).

## Summary Judgment

Summary judgment should be granted "where the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In ruling on a summary judgment motion, the court may not weigh the evidence or resolve issues of fact; disputed facts must be left for resolution at trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).  The court is to examine all admissible facts, viewing the entirety of the record and accepting all facts and drawing all reasonable inferences in favor of the non-moving party.  Erdman v. City of Ft. Atkinson, 84 F.3d 960, 961 (7th Cir. 1996); Smith v. Shawnee Library Sys., 60 F.3d 317, 320 (7th Cir. 1995); Anderson, 477 at 325.  Any doubt as to the existence of a genuine issue for trial is resolved against the moving party.  Anderson, 477 U.S. at 255; Trotter v. Anderson, 417 F.2d 1911 (7th Cir. 1969).

If the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact.  Matsushita Elec. Indus. Co.

v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  Federal Rules
of Civil Procedure 56(e) requires the non-moving party to go beyond
the pleadings and produce evidence of a genuine issue for trial.
Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  If the non-
moving party fails to make a showing sufficient to establish the
existence of an element essential to that party and on which that
party will bear the burden of proof at trial, then summary judgment
is proper.  Id. at 322.  A scintilla of evidence in support of the
non-moving party's position is not sufficient to oppose
successfully a summary judgment motion; "there must be evidence on
which the jury could reasonably find for the [non-movant]."
Anderson, 477 U.S. at 250.

### Standard of Review

In Ruiz v. Continental Casualty Co., 400 F.3d 986 (7th Cir.
2005), as in this case, the standard of review to be utilized with
respect to the underlying decision of the insurer to deny benefits
was vigorously disputed by the parties.  In Ruiz, the court
explained that "a denial of benefits will be reviewed de novo
'unless the benefit plan gives the administrator or fiduciary
discretionary authority to determine eligibility for benefits or to
construe the terms of the plan.'" Id. at 989 (quoting Firestone
Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, (1989)).  If the
plan documents contain language granting the administrator or
fiduciary discretion to construe plan language or interpret plan
terms, then a benefit determination is to be reviewed under an
arbitrary and capricious standard.  Firestone, 489 U.S. at 115;

14

Herzberger v. Standard Ins. Co., 205 F.3d 327, 331 (7th Cir. 2000).

In Ruiz, as in this case, the plan documents "provided that '[t]he Administrator and other Plan fiduciaries have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to benefits in accordance with the Plan.'" Id. at 988.  In determining the applicable standard of review, Ruiz, held that the analysis has two parts.  "First, is Continental a fiduciary?  Second, assuming Continental is a fiduciary, are fiduciaries granted sufficient discretionary authority under the terms of the Plan?  If the answer to either of these questions is no, we will review Continental's decision to deny benefits de novo.  If, on the other hand, the answer to both questions is yes, we will review Continental's decision under the highly deferential arbitrary and capricious standard." Id. at 989.

In their analysis of the first part, the Ruiz court stated, "The measure of whether a person is a fiduciary is not whether that person is formally designated as such." Id. at 990.  Instead, "A court should look to whether a proposed fiduciary exercises control or authority over a particular benefit in an ERISA plan." Id.  In support of this notion, the Ruiz court also cited Aetna Health Inc. v. Davila, 542 U.S. 200, (2004), in which the Supreme Court held that HMOs making discretionary decisions regarding eligibility for plan benefits, must be treated as plan fiduciaries. Id. at 2502. In Davila, the Supreme Court noted that, "[a] benefit determination under ERISA...is generally a fiduciary act." Id. at 2501.

The court in Ruiz then analyzed the second part, holding that

15

a specific provision in the plan granting discretionary authority over the eligibility of benefits was sufficient to grant the insurer the authority to construe its terms or determine eligibility for benefits.  Id. at 990.  Finally, Ruiz found that "the insurance policy and Certificate are plan documents," and the "plan documents granted [the insurer] the requisite discretionary authority."  Id. at 991.

This case is indistinguishable from Ruiz.  In Ruiz, the Seventh Circuit was confronted with identical plan language as found in this case and held that the arbitrary and capricious standard of review applied.  Further, according to the U.S. Supreme Court, Continental must be treated as a plan fiduciary as they, in fact, made a discretionary decision regarding the eligibility of Plaintiff for plan benefits.  Therefore, Plaintiff's argument that Continental was not a fiduciary because they were not designated as such is without merit.

This case is also indistinguishable from Ruiz, in that the Plan documents in this case also granted Continental the authority to construe the Plan's terms and determine eligibility for benefits.  Plaintiff's position that the Ruiz court's determination that the insurer had discretionary authority only because of an express grant of authority to the insurer, in that plan, is also without merit.  Even without the specific mention of Continental's name, the Plan grants discretionary authority to the, "administrator **and** other Plan fiduciaries."  Since, Continental qualifies as a fiduciary by virtue of their actions in making a

16

policy determination under the Plan, the Plan gives discretionary authority to Continental, as well as Mercantile, the Plan administrator.

Accordingly, Continental's decision to deny Plaintiff benefits will be reviewed under an arbitrary and capricious standard.

### Plaintiff's Motion for Summary Judgment

A fiduciary's decision to deny a claim for benefits is entitled to "great deference" under the arbitrary and capricious standard of review. Ruiz, 400 F.3d at 991 (quoting Blickenstaff v. R.R. Donnelley & Sons Co. Short Term Disability Plan, 378 F.3d 669, 677 (7th Cir. 2004)). The court is not to interfere with the plan administrator's decision unless he "not only made a wrong call, but ...a 'downright unreasonable' one." James v. General Motors Corp., 230 F.3d 315 (7th Cir. 2000) (quoting Chojnacki v. Georgia-Pacific Corp., 108 F.3d 810, 816 (7th Cir. 1997). That is, "this court will not substitute the conclusion it would have reached for the decision of the administrator, as long as 'the administrator makes an informed judgment and articulates an explanation for it that is satisfactory in light of the relevant facts.'" Herman v. Central States, Southeast and Southwest Areas Pension Fund, 423 F.3d 684, 692 (7th Cir. 2005) (quoting Carr v. Gates Health Care Plan, 195 F.3d 292, 294 (7th Cir. 1999) (internal quotation omitted), cert. Denied, 529 U.S. 1068, (2000)).

However, the court has noted that the deferential arbitrary and capricious standard is not a "rubber stamp," so that, "'[e]ven under the deferential review we will not uphold a termination where

17

there is an absence of reasoning in the record to support it.'" <u>Id</u>. at 693 (<u>quoting</u> <u>Hackett v. Xerox Corp. Long-Term Disab. Income</u>, 315 F.3d 771, 774-75 (7th Cir. 2003). A satisfactory explanation "is one that gives 'the specific reasons for the denial', but it need not explain 'the reasoning behind the reasons.'" <u>Id.</u> ( <u>quoting</u> <u>Gallo v. Amoco Corp.</u>, 102 F.3d 918, 922 (7th Cir. 1996) (internal quotation omitted), <u>cert. denied</u>, 521 U.S. 1129, (1997)). The Seventh Circuit has further noted that substantial compliance is sufficient to meet that requirement. <u>Hackett</u>, 315 F.3d at 775 (<u>citing</u> <u>Haplin v. W.W. Grainger</u>, 962 F.2d 685, 688-89 (7th Cir. 1992)). The court in <u>Haplin</u> stated that in order to meet the substantial compliance standard, "the administrator must weigh the evidence for and against [the denial or termination of benefits], and within reasonable limits, the reasons for rejecting evidence must be articulated." <u>Id.</u> at 695; <u>Hackett</u>, 315 F.3d at 775. In this case, the Court finds Continental's decision to deny Plaintiff's claim for benefits was unreasonable as a matter of law, thus, their decision must be judged as arbitrary and capricious.

In order to be entitled to benefits under the Plan, Plaintiff was required to submit proof that her condition was of the severity to render her "continuously unable to perform the substantial and material duties of [her] occupation." Plaintiff submitted evidence from several doctors; her treating Neurologist Dr. Sullivant; Mayo Clinic Neurologists Dr. Lucchinetti and Dr. Pirko; Mayo Clinic Gastroenterologists Dr. Kim, Dr. Alexander, and Dr. Bharucha; and Dr. Daly. All of which indicated possibly or definitely that

18

Plaintiff suffered from MS. The gastroenterologists ultimately concluded Plaintiff's bowel and incontinence problems were a result of both Plaintiff's MS problems and a past related birth canal injury.

Relying solely on Dr. Sullivant's conclusions, Dr. Truchelut, reported, that Plaintiff could perform low-level sedentary activities as long as she avoided hazardous workplace environments. Regarding Plaintiff's GI problems, Dr. Truchelut opined that there was not enough evidence in the record to conclude that Plaintiff's GI/anorectal dysfunction problems would render her unable to work **at all**, as Plaintiff's desk needed only be close to a restroom. Therefore, after Dr. Truchelut wrote his opinion, Continental wrote to Plaintiff's employer and requested that the company submit a physical demands analysis, so that Continental could clarify Plaintiff's job aspects for the appeal.  This information revealed that Plaintiff's employer could not move Plaintiff's desk down to the basement, where the female restroom was located.   Dr. Alexander, Dr. Bharucha, and even Dr. Truchelut had opined that Plaintiff's GI/anorectal problems required her to be close to a restroom.  Dr. Alexander further stated that Plaintiff would not be able to hold on to any type of meaningful employment since she frequently needs to rush to the bathroom, and often times cannot make it due to other infirmities.  Further, Plaintiff's employer indicated on July 2, 2002 that they would not be able to make any modifications to Plaintiff's job, and again on February 14, 2003, when they indicated that while they were providing some

19

accommodations to Plaintiff's job duties, they still would not be able to relocate Plaintiff's desk close to the restroom. Nevertheless, Continental denied Plaintiff's claim on review stating that they still did not have enough evidence regarding Plaintiff's GI/anorectal dysfunction problems to conclude that this would render her unable to work at all, ignoring Plaintiff's employer's statements that it would not relocate Plaintiff's desk close to the bathroom. Further, while Continental included, in their denial letter, the workplace accommodations Plaintiff's employer had indicated it could provide on the Physical Demand Analysis--such as having someone else carry the cash drawer, and push the loan cart--as part of their conclusion that Plaintiff was still able to do her job, they neglected the employer's submission (that they would not move Plaintiff's desk close to the bathroom) when concluding Plaintiff's GI/anorectal dysfunction would not render her unable to work at all.  It is clear that Defendant chose to completely ignore the  unfavorable information that Plaintiff's employer submitted in regards to not being able to move Plaintiff's desk close to a restroom, but then included the information regarding the workplace accommodations that would still allow Plaintiff to work based on Dr. Sullivant's advice.

This is unreasonable.  Defendant was required to give a specific reason denying Plaintiff's claim.  Hackett, 315 F.3d at 774-75.  They failed to do this when they ignored Dr. Alexander's opinion--that Plaintiff would not be able to hold on to any type of meaningful employment since she frequently needs to rush to the

bathroom, and often times cannot make it due to other infirmities--without explanation, when they ignored the restroom accommodation notation by their own Dr. Truchelut, and when they ignored Plaintiff's employer's response to the Physical Demands Analysis.

It is true that the Seventh Circuit Court of Appeals has held that it is not downright unreasonable to rely on the opinion of one physician over another. However, there needs to be a specific reason for rejecting another physician's reliable evidence. <u>See Black & Decker Disability Plan v. Nord</u>, 538 U.S. 822, 832 (2003)(holding "Plan Administrators may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician). Here Continental did not give any reason for rejecting or discounting Dr. Alexander's conclusions.[1] Defendant's decision in this case to deny Plaintiff's claim was therefore unreasonable.

Defendant also cites <u>Donato v. Metropolitan Life Ins. Co.</u>, 19 F.3d 375 (7th Cir. 1994) in support of their decision to choose the opinion of Dr. Truchelut and Dr. Sullivant over that of Dr. Alexander's. However, <u>Donato</u>, although similar in some aspects, is distinguishable from the case at hand. In <u>Donato</u>, as in this case, the insurer/administrator's decision came down to a permissible

---

[1]In Continental's Motion for Summary Judgment, Continental argues they chose Dr. Sullivant's opinion over Dr. Alexander's because Dr. Sullivant was plaintiff's treating physician, whereas, Dr. Alexander only examined Plaintiff twice. However, Continental does not cite this as a reason for Plaintiff's disability claim in the appeal letter or anywhere else in the Administrative record.

choice between that of the Plaintiff's doctors and, that of the insurer's medical consultant. However, in Donato, the insurer actually disagreed with Plaintiff's doctors.  And the insurer stated specifically the reasons for the denial of Plaintiff's claim for disability benefits, i.e. the lack of recognition in the medical community of clinical ecology.  In the case at hand, Dr. Truchelut never disagreed with Dr. Alexander's conclusion that Plaintiff had significant "GI/anorectal dysfunction."  Instead, as Plaintiff correctly points out, Dr. Truchelut "punted," stating that Plaintiff's GI/anorectal dysfunction could still allow Plaintiff to do her job as long as she was close to a restroom, however he did not have enough evidence on file to come to the conclusion that this problem would render Plaintiff unable to work at all.  Dr. Truchelut's suggestion that Plaintiff could still work as long as she was close to a restroom fit right along with Dr. Alexander's observations.  And again, once Continental had the required information on appeal to make that determination (i.e., the employer's response to Continental's inquiry of Plaintiff's job demands) they should have given a specific reason for rejecting Dr. Alexander's opinion.  See Ladd v. ITT Corp., 148 F.3d 753, 756 (7th Cir. 1998)(holding that had the consulting physician given reasons for disagreeing with the previous examining doctors' conclusions, the court would have had to affirm the consulting physician's decision).  Defendant merely regurgitated Dr. Truchelut's previous conclusion, even though they had the evidence Dr. Truchelut lacked when he made his determination.  This renders Continental's

22

decision to deny Plaintiff's claim for disability benefits an arbitrary and capricious one.

Finally, Continental argues they chose Dr. Sullivant's opinion, that Plaintiff could possibly work a low-level sedentary job, over that of Dr. Alexander's, because Dr. Sullivant was Plaintiff's treating physician, whereas, Dr. Alexander only examined Plaintiff twice.   However, Continental's argument is without merit.[2]   Dr. Sullivant is Plaintiff's neurologist. Therefore, Dr. Sullivant examined Plaintiff with respect to her neurological problems with balance, gait, dizziness, and vision. In fact, Dr. Sullivant told Plaintiff to see her GI doctor for her bowel problems.   After Plaintiff did so, all three doctors she visited about her bowel problems diagnosed Plaintiff with fecal incontinence, and Dr. Alexander attributed her bowel problems to her MS and previous related birth canal injuries.   In Plaintiff's October 28, 2002 visit with Dr. Sullivant, he agreed with the GI doctor's diagnosis of MS.   Since Dr. Sullivant is Plaintiff's neurologist doctor, he was reporting on an entirely different aspect of her problems with MS.   And Dr. Alexander was reporting on Plaintiff's bowel problems associated with her MS. These are not conflicting opinions, but merely reports on different aspects of the same disease.   It is therefore immaterial that Dr. Sullivant examined Plaintiff more times than Dr. Alexander.   He should have, because he was her treating physician.   Dr. Sullivant only sent Plaintiff to a GI doctor for her bowel problems.   Since, Dr.

---

[2]See FN 1.

Sullivant's and Dr. Alexander's conclusions were not conflicting, then Continental's decision to choose Dr. Sullivant's conclusion over Dr. Alexander's conclusion was clearly unreasonable.

In summary, Plaintiff is entitled to summary judgment because there is no genuine issue as to any material fact that Plaintiff was qualified, as defined by the Plan, as having "Total Disability" since March 11, 2002.  Plaintiff was unable to do her job because her GI/anorectal dysfunction problems required that she be close to a restroom.  Plaintiff's employer indicated they would not be able to relocate Plaintiff's desk closer to the restroom, and Defendant submitted no evidence suggesting Plaintiff would still be able to do her job without this accommodation.  Therefore, summary judgment is appropriate.

### Defendant Continental's Motion for Summary Judgment

In deciding Continental's motion for summary judgment, the Court is required to independently examine all admissible facts, viewing the entirety of the record, including all reasonable inferences, in the light most favorable to Plaintiff–the opposite of what it did in considering Plaintiff's motion for summary judgment.  See, Ozlowski v. Hendersen, No.99-C756, 1999 U.S. Dist. LEXIS 19427 at *7 (N.D. Ill. Dec. 16, 1999).  Having considered the record in that regard, the material facts have not changed and there are no disputed issues of material facts.  As discussed supra, the undisputed facts show that Plaintiff is "totally disabled" as that term is defined in the Plan, and therefore as a matter of law, Continental would not be entitled to judgment in its

24

favor on that issue.   Therefore, Continental's motion for summary judgment is denied.

## **Defendant's Motion to Strike Exhibits to Plaintiff's Motion for Summary Judgment**

Plaintiff's affidavit, Social Security decision, and discovery responses were not considered in the decision of this case, therefore Defendant's motion to strike is moot.

## Conclusion

IT IS THEREFORE ORDERED that Plaintiff's Motion for Summary Judgment [Doc. # 22] is GRANTED.  Having ruled in Plaintiff's favor on the issue of Defendant's liability to Plaintiff under the Plan, the issue of damages sustained by Plaintiff now remains for disposition.  This case is set for status review on June 23, 2006 at 2:00 p.m. by telephone to schedule a timetable to dispose of this issue.

IT IS FURTHER ORDERED that Defendant Continental's Motion for Summary Judgment And/Or Judgment on the Merits [Doc. # 21] is DENIED.

IT IS FURTHER ORDERED that Mercantile Defendants' Adoption of Defendant Continental's Motion for Summary Judgment [Doc. # 23] is DENIED.

IT IS FURTHER ORDERED that Defendant Continental's Motion to Strike Exhibits to Plaintiff's Motion for Summary Judgment [Doc. # 25] is DENIED AS MOOT.


Entered this  8th  day of June, 2006.


                              s/ Joe B. McDade
                              JOE BILLY McDADE
                          United States District Judge